

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-6-2005

# USA v. Gen Battery Corp Inc

Precedential or Non-Precedential: Precedential

Docket No. 03-3515

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Gen Battery Corp Inc" (2005). *2005 Decisions.* Paper 494.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/494

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-3515

_____

UNITED STATES OF AMERICA

v.

GENERAL BATTERY CORPORATION, INC.;
EXIDE CORPORATION

Exide Corporation,
                                             Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 00-cv-03057
(Honorable Ronald L. Buckwalter)

_____

Argued January 26, 2005
Before:  SCIRICA, *Chief Judge*,
RENDELL and FISHER, *Circuit Judges*

(Filed  September 6, 2005)

ROBERT L. COLLINGS, ESQUIRE (ARGUED)
CARL A. SOLANO, ESQUIRE
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
        Attorneys for Appellant

JOHN T. STAHR, ESQUIRE (ARGUED)
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C. 20026

NURIYE C. UYGUR, ESQUIRE
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
        Attorneys for Appellee,
        United States of America

_____

OPINION OF THE COURT

_____

SCIRICA, *Chief Judge*.

2

This appeal addresses successor liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.*, for environmental response costs incurred by the United States at a lead-contaminated Superfund site. The District Court granted summary judgment in favor of the United States on a "de facto merger" theory of successor liability. We will affirm.

**I.**

The matter begins with a now defunct company, Price Battery Corporation. From the 1930s through 1966, Price Battery manufactured lead acid batteries at a plant in Hamburg, Pennsylvania. During that time, it arranged for the disposal of waste materials—including spent battery casings—at locations in and around Hamburg. In 1992, the United States Environmental Protection Agency discovered two of the disposal sites, and upon further investigation found three more. The properties contained elevated levels of lead. After testing and monitoring, the EPA concluded remedial action was necessary to protect human health. The United States has since incurred response costs of several million dollars associated with the removal of contaminated soil and the installation of a remedial "cap" at the properties.

Seeking to identify a responsible party under CERCLA, *see* 42 U.S.C. § 9607(a)(1)-(4), EPA determined that Price Battery, through its disposal of battery casings, was responsible for the lead contamination. Price Battery, however, was long

3

since out of business, having been acquired for cash and stock by General Battery Corporation in 1966. General Battery, in turn, merged with Exide Corporation in 2000. The United States filed this action against Exide, alleging it was responsible for Price Battery's CERCLA liability as a successor in interest.

The parties agree that as a consequence of the 2000 merger, Exide is General Battery's successor. The disputed issue is whether General Battery, by virtue of its 1966 acquisition of Price Battery, was a successor to Price Battery. The relevant aspects of the Price/General transaction are as follows. On February 11, 1966, General Battery, a diversified public company, entered into an agreement with Price Battery, a smaller, privately-held battery manufacturing firm. Price Battery was owned by a single shareholder, William F. Price Sr., who sold General Battery most of his company's assets in exchange for $2.95 million in cash, 100,000 shares of General Battery stock, and a seat on General's board of directors.[1] At

---

[1]The only Price Battery asset nominally excluded from the transaction was its real property, including its manufacturing plant. Price Battery sold its real property and the building to a nonprofit development organization for $1.8 million. The development organization, in turn, leased the facility back to General Battery until 1978, when the deed was transferred to General for $1.00. Taking this into account, Price Sr. received $4.75 million cash and 100,000 shares of General Battery stock for the Price Battery enterprise.

the time, 100,000 General Battery shares were valued at approximately $1 million and represented 4.537% of General's outstanding equity. William Price Sr.'s resulting stake in General Battery was comparable to that of the company's co-founders, W.A. Shea and H.J. Nozensky, who in 1966 remained on General's board and held 5.12% and 4.44% of its outstanding equity, respectively.

Under the agreement, General Battery purchased Price Battery's equipment, materials, intellectual property and inventory. It also assumed Price Battery's contractual obligations, including employment contracts, and assumed all other liabilities appearing on Price Battery's balance sheet. General Battery indemnified Price Battery for claims, other than future tort claims, arising from Price Battery's operations, and agreed to continue the employment of three senior Price Battery officers—the president, the executive vice president, and the vice president of manufacturing.

After the transaction, General Battery continued manufacturing batteries at the Hamburg plant. Price Battery's plant superintendent and middle managers retained their positions, as did the union employees, office personnel and sales force. General Battery produced the same batteries that Price Battery had produced and honored Price Battery's contracts with existing customers and vendors. Price Battery, meanwhile, was required under the agreement to immediately change its name to Price Investment Company and to retain $150,000 in cash pending completion of an audit. The agreement contemplated

that following the audit and any corresponding adjustment in the purchase price, Price Investment would liquidate on or before December 31, 1966. From the transaction closing in February of 1966 until filing for a certificate of corporate dissolution in February of 1967, Price Investment Company had no operations.

On cross-motions for summary judgment, the District Court held the Price/General transaction constituted a common law "de facto merger." In the District Court's view, the continuity of location, assets, products, operations, management, employees, contracts, and shareholders between Price Battery and General Battery, and the subsequent liquidation and dissolution of Price Battery, establish General Battery (and now Exide) as Price Battery's successors in interest under CERCLA. *United States v. Exide Corp.*, 2002 U.S. Dist. LEXIS 3303 (E.D. Pa. Feb. 27, 2002). Following the District Court's entry of summary judgment, the parties stipulated to past CERCLA response costs at the Hamburg site in the amount of $6,500,000. Exide retained the right to file this appeal as to liability.

## II.

The District Court had jurisdiction under CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. Our summary judgment standard of review is plenary. *In re Mushroom Transp. Co.*, 382 F.3d 325, 335 (3d Cir. 2004) (drawing all reasonable inferences in favor of the non-moving party).

## III.

We return, once again, to the difficult area of indirect liability under CERCLA.[2]  CERCLA is a "sweeping" federal remedial statute, enacted in 1980 to ensure that "*everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *United States v. Bestfoods*, 524 U.S. 51, 56 n.1 (1998) (quoting *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 21 (1989) (plurality opinion of Brennan, J.)) (emphasis in original).  "As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Id.* at 55 (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994)).

CERCLA is not, however, "a model of legislative draftsmanship," *Exxon Corp. v. Hunt*, 475 U.S. 355, 363 (1986)—and successor liability is one of its puzzles.  Although

---

[2] *See, e.g., Alcoa v. Beazer E.*, 124 F.3d 551 (3d Cir. 1997) (shareholder, successor and indemnitor liability); *SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154 (3d Cir. 1996) (indemnitor and successor liability); *United States v. USX Corp.*, 68 F.3d 811 (3d Cir. 1995) (shareholder and officer liability); *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209 (3d Cir. 1993) (parent-subsidiary liability); *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir. 1988) (corporate successor liability).

the statute fails to address the issue expressly, it is now settled that CERCLA incorporates common law principles of indirect corporate liability, including successor liability. *See* 42 U.S.C. § 9601(21) (including "corporations" among the "persons" covered by CERCLA); 1 U.S.C. § 5 (providing, as a rule of interpretation, that "the word 'company' or 'association', when used in reference to a corporation, shall be deemed to embrace the words 'successors and assigns of such company or association'"); *Bestfoods*, 524 U.S. at 63-64 (holding CERCLA incorporates common law of parent/subsidiary veil-piercing); *Smith Land*, 851 F.2d at 92 (holding CERCLA imposes successor liability).[3]

The threshold issue on appeal is whether to apply a uniform federal rule of successor liability, or whether to apply

---

[3]The courts of appeals that have addressed the issue are unanimous in recognizing successor liability under CERCLA. *United States v. Davis*, 261 F.3d 1, 54 (1st Cir. 2001); *N.Y. v. Nat'l Servs. Indus.*, 352 F.3d 682 (2d Cir. 2003); *Smith Land*, 851 F.2d at 92 (3d Cir. 1988); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837 (4th Cir. 1992); *Anspec v. Johnson Controls, Inc.*, 922 F.2d 1240, 1245 (6th Cir. 1991); *N. Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642, 649 (7th Cir. 1998); *United States v. Mex. Feed & Seed Co.*, 980 F.2d 478, 486 (8th Cir. 1992); *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 364 (9th Cir. 1997).

the law of a particular state. The second issue is whether Exide is liable as a successor.

**A.**

We have previously addressed and decided the threshold issue. In *Smith Land*, we held that CERCLA successor liability is a matter of uniform federal law, as derived from "the general doctrine of successor liability in operation in most states." 851 F.2d at 92 (3d Cir. 1988). Likewise, we held in *Lansford-Coaldale* that "given the federal interest in uniformity in the application of CERCLA, it is federal common law, and not state law, which governs" matters of indirect CERCLA liability. 4 F.3d at 1225 (3d Cir. 1993) (discussing parent/subsidiary veil-piercing).

In the course of holding that CERCLA authorizes successor liability, we reasoned that "Congress expected the courts to develop a federal common law to supplement the statute," that "[i]n resolving the successor liability issues here, the district court must consider national uniformity," and that "[t]he general doctrine of successor liability in operation in most states should guide the court's decision rather than the excessively narrow statutes which might apply in only a few states." *Smith Land*, 851 F.2d at 91-92. This reasoning is unambiguous, essential to the *Smith Land* disposition, and controlling on the issue before us. *Smith Land* expressly rejected the position that a *particular* state's successor liability law applies under CERCLA. *Lansford-Coaldale*, another

9

indirect liability case under CERCLA, is to the same effect. 4 F.3d at 1225. The Supreme Court has neither addressed nor disturbed these holdings. *See Bestfoods*, 524 U.S. at 64 n.9 (noting, but not resolving, disagreement over "whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law").

Relying principally on *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994), a case decided under the federal banking statutes, and *Davis*, 261 F.3d at 54 (1st Cir. 2001), a case applying state successor liability law under CERCLA, Exide invites us to overrule *Smith Land*.

In *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979), the Supreme Court addressed the propriety of applying state law under an ambiguous or incomplete federal statute. The Court emphasized that, "[w]hether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependant upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'" *Id.* at 728 (quoting *United States v. Standard Oil*, 332 U.S. 301, 310 (1947)). The issue in *Kimbell Foods* was whether, absent an express statutory directive, a uniform federal rule of lien priorities was necessary under certain federal loan programs. *Id.* at 718. Employing a three-factor analysis, the Court answered this question in the negative, holding state law governed the priority of the liens. *Kimbell Foods* considered (1) whether the federal program, by its very nature, required uniformity; (2) whether application of

10

state law would frustrate specific objectives of the federal program; and (3) whether application of uniform federal law would disrupt existing commercial relationships predicated on state law. *Id.* at 728-29.

Emphasizing the second *Kimbell Foods* factor—a conflict with an identifiable federal interest—the Supreme Court in *O'Melveny* cautioned against the unwarranted displacement of state law, holding that state rules of decision generally fill interstitial gaps in federal statutes. 512 U.S. at 87. The displacement of state law is particularly disfavored in the area of corporate law, because business decisions typically proceed in reliance on the applicable state standards. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 105 (1991). State corporation law generally should be integrated into the federal statutory regime, unless there exists "a significant conflict between some federal policy or interest and the use of state law." *O'Melveny*, 512 U.S. at 87; *see also Kamen*, 500 U.S. at 107; *Kimbell Foods*, 440 U.S. at 728; *see generally* Henry J. Friendly, *In Praise of Erie—And of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383 (1964). The principal question here, then, is whether CERCLA requires a uniform federal standard of corporate successor liability.

As noted, *Smith Land* and *Lansford-Coaldale* expressly held that CERCLA requires uniform federal standards of successor and veil-piercing liability, respectively. Neither case has been overruled. *O'Melveny*, a case brought under a state law cause of action (as opposed to a federal liability statute),

11

512 U.S. at 83, dealing with the preemptive force of the federal *banking* statutes, *id.* at 86, did not overrule our CERCLA-specific holdings in *Smith Land* and *Lansford-Coaldale*. *O'Melveny* involved claims brought by the Federal Deposit Insurance Corporation (FDIC), as the receiver of a federally insured bank, under California tort law. The FDIC argued, notwithstanding its reliance on a state law cause of action, that uniform federal liability standards should preempt the California rules of decision. The Supreme Court disagreed, holding the relevant federal statutes neither authorized nor required the creation of a preemptive body of federal common law in cases arising under state law causes of action. *Id.* at 89. *Atherton v. FDIC*, another decision cited by Exide Corporation in which the Court cautioned against the unwarranted "creation" of federal common law, also involved the preemptive scope of the federal banking laws. 519 U.S. 213, 218 (1997).

*Smith Land* and *Lansford-Coaldale*, in contrast, held that uniform standards of indirect corporate liability are necessary under CERCLA, an environmental liability statute enforced under its own federal cause of action. *O'Melveny* and *Atherton* neither addressed the CERCLA-specific reasoning of *Smith Land* and *Lansford-Coaldale* nor overruled their CERCLA-specific holdings.

*Bestfoods*, a case decided after *O'Melveny* and *Atherton*, is the only Supreme Court decision touching on the CERCLA question at issue. But the Court there explicitly declined to resolve the circuit split on whether CERCLA borrows a

12

particular state's law of indirect corporate liability. *Bestfoods*, 524 U.S. at 64 n.9. *Bestfoods* neither cited *O'Melveny* nor otherwise suggested that uniform CERCLA successor liability standards were inappropriate.

If anything, *Bestfoods* cuts in favor of a uniform federal standard. *Bestfoods* applied "fundamental" and "hornbook" principles of indirect corporate liability, not the law of any particular state. 524 U.S. at 61-62. The court of appeals in *Bestfoods* had applied Michigan law. *United States v. Cordova Chem. Co.*, 113 F.3d 572, 580 (6th Cir. 1997) (en banc). But the Supreme Court declined to apply Michigan law and instead looked to the general "hornbook" rule of veil-piercing. The Court's reliance on the general standard is a different matter than borrowing the law of a *particular* state. Applying a particular state's law requires a state-by-state interpretation of the federal liability statute—a result, in the case of successor liability under CERCLA, that we believe conflicts with the statutory objectives. *See* discussion *infra*.

A uniform federal standard is also consistent with recent Supreme Court decisions in which gaps in federal liability statutes were filled not with the law of a particular state, but with general common law principles. *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003) (looking to the general common law definition of "servant" to define the term "employee" under the ADA); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) (relying on "the general common law of agency, rather than on

13

the law of any particular State," in defining the term "agent" under Title VII) (citation omitted). Just as the ADA and Title VII require uniform federal definitions of the terms "employee" and "agent," respectively, CERCLA requires a uniform federal definition of "successor corporation." As the Court explained in *Burlington*, "[t]he resulting federal rule, based on a body of case law developed over time, is statutory interpretation pursuant to congressional direction," not the free-wheeling creation of federal common law. 524 U.S. at 755.

For these reasons, we believe that *Smith Land* and *Lansford-Coaldale* have not been undermined by recent Supreme Court decisions and remain circuit law. *See* Third Circuit Internal Operating Procedure 9.1 ("[T]he holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so.").

Moreover, we believe *Smith Land* is consistent with CERCLA's objectives. CERCLA is a federal liability statute, applicable nationwide to those responsible for hazardous-waste contamination. Liability under the statute is a matter of federal law. 42 U.S.C. § 9613(f)(1) (CERCLA contribution actions "shall be governed by Federal law"); *Kimbell Foods*, 440 U.S. at 726 ("This Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs.").

14

It is true that successor tort liability, including successor environmental liability, rests at the intersection of tort and corporate law—both areas largely regulated by the states. But it does not necessarily follow that CERCLA's statutory scheme is served by borrowing a particular state's successor liability law as the federal rule of decision. The choice of law framework governing successor liability remains unsettled.[4] And although the general doctrine of successor liability is "largely uniform" under state law, *Atchison*, 159 F.3d at 363 (9th Cir. 1997) (citation omitted), this uniformity is less apparent when the general standards are applied in specific cases.[5] Beneath a

---

[4]*Compare In re Asbestos Litig. (Bell)*, 517 A.2d 697, 699 (Del. Super. Ct. 1986) (characterizing successor liability as a corporate/contract doctrine), *with Savage Arms Inc. v. West. Auto Supply Co.*, 18 P.3d 49, 53 (Alaska 2001) (collecting cases, noting that "state courts have split on the question," and characterizing successor products liability as a tort doctrine); *see also Ruiz v. Blentech Corp.*, 89 F.3d 320, 322 (7th Cir. 1996) (describing a question of successor liability choice of law as "rather mystifying"); *SmithKline Beecham Corp. v. Rohm & Haas Co.*, 1995 U.S. Dist. LEXIS 3361, at *12-26 (E.D. Pa. Mar. 17, 1995) (wrestling with choice of law for CERCLA successor liability).

[5]For example, some states emphasize "continuity of ownership" as a key element of successor liability. *Cargo Partner AG v. Albatrans Inc.*, 352 F.3d 41, 47 (2d Cir. 2003)

15

veneer of uniformity, the "entire issue of successor liability . . . is dreadfully tangled, reflecting the difficulty of striking the right balance between the competing interests at stake." *EEOC v. Vucitech*, 842 F.2d 936, 944 (7th Cir. 1988).

---

(New York law). Others do not. *Woodrick v. Jack J. Burke Real Estate, Inc.*, 703 A.2d 306, 313-14 (N.J. Super. Ct. App. Div. 1997) (finding de facto merger absent continuity of ownership). Some states apply unique successorship rules in products liability and environmental cases. *Dawejko v. Jorgensen Steel Co.*, 434 A.2d 106, 111-12 (Pa. Super. Ct. 1981); *Dep't of Transp. v. PSC Res., Inc.*, 419 A.2d 1151 (N.J. Super. Ct. Law Div. 1980). Others do not. *Bielagus v. EMRE of N.H., Corp.*, 826 A.2d 559 (N.H. 2003). In some states, the governing rules are difficult to ascertain. *Compare Hart v. Bruno Mach. Corp.*, 679 N.Y.S.2d 740 (N.Y. App. Div. 1998) (applying product line theory of successor liability), *with City of N.Y. v. Charles Pfizer & Co.*, 688 N.Y.S.2d 23 (N.Y. App. Div. 1999) (rejecting same theory). Even jurisdictions in broad agreement on the appropriate legal standards may apply them differently. *SmithKline Beecham*, 1995 U.S. Dist. LEXIS 3361, at *23-24 (E.D. Pa. Mar. 17, 1995) (noting differences between New Jersey and Pennsylvania application of common de facto merger elements). Reconciling these holdings poses some difficulty. *See Cargo Partner AG v. Albatrans, Inc.*, 207 F. Supp. 2d 86, 93-114 (S.D.N.Y. 2001).

16

In *Atchison*, the Court of Appeals for the Ninth Circuit, in considered dictum, expressed doubt that a uniform federal rule of successor liability is necessary under CERCLA. 159 F.3d at 364. The court reasoned that "[i]f state law varied widely on the issue of successor liability, perhaps the need for a uniform federal rule would be more apparent." *Id.* at 363. But we respectfully disagree with *Atchison*'s premise. State law does vary substantially on the issue of successor liability, and its unpredictability counsels in favor of CERCLA uniformity.

The successor liability issues raised in this case are illustrative. Whether a mixed cash/stock acquisition triggers successor liability under the de facto merger doctrine does not command uniform treatment among the states.[6] Whether

---

[6]*Compare Ladenburg Thalmann & Co. v. Tim's Amusements, Inc.*, 275 A.D.2d 243, 248 (N.Y. App. Div. 2001) (finding continuity of ownership in assets-for-promissory note transaction), *and Fenderson v. Athey Prods. Corp.*, 581 N.E. 2d 288, 292 (Ill. Ap. Ct. 1991) (Illinois law) (no requirement "that all or even most of the purchase price" be paid in stock), *with Nova Ribbon Prods. v. Lincoln Ribbon, Inc.*, 1995 U.S. Dist. LEXIS 4322, at *20 (E.D. Pa. Mar. 30, 1995) (Pennsylvania law) (holding de facto merger liability turns on whether transaction is "primarily" for stock). Even within New Jersey, the continuity of ownership standard appears unsettled in mixed cash/stock transactions. *Compare Wilson v. Fare Well Corp.*, 356 A.2d 458, 461 (N.J. Super. Ct. Law Div. 1976) (imposing

successor liability attaches to a transaction where the seller receives a "small percentage" of the buyer's outstanding equity is also unsettled.[7]  For example, New Jersey corporations may be held responsible for successor environmental liability from which New York corporations may be exempt.  *Compare PSC*, 419 A.2d 1151 (N.J. Super. Ct. Law Div. 1980) (applying expansive theory of successor liability to environmental torts), *with Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 198 (N.Y. 1983) (adhering to traditional concepts of successor liability).  We doubt Congress intended to incorporate such variations under a comprehensive federal liability statute.  *See*

---

successor liability where stock comprises less than half of purchase price), *with McKee v. Harris-Seybold Co.*, 264 A.2d 98, 104 (N.J. Super. Ct. Law Div. 1970) (no continuity of ownership in mixed cash/stock transaction).

[7]*Compare Cargill, Inc. v. Beaver Coal & Oil Co., Inc.*, 424 Mass. 356, 361 (1997) (Massachusetts law) (finding continuity of ownership where seller receives 12.5% stake in acquiring company), *and Glynwed, Inc. v. Plastimatic Inc.*, 869 F. Supp. 265, 277 (D.N.J. 1994) (New Jersey law) ("continuity of ownership, not uniformity, is the test"), *with Savage Arms*, 18 P.3d at 58 (Alaska 2001) (noting that percentage of shares owned is an "important fact"), *and Kaleta v. Whittaker Corp.*, 583 N.E.2d 567, 571 (Ill. App. Ct. 1991) (finding no continuity of ownership where seller received a "de minimis" .00037% stake in buyer).

18

42 U.S.C. § 9613(f)(1) (CERCLA contribution actions "shall be governed by Federal law"); *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) ("federal statutes are generally intended to have uniform nationwide application").

A more uniform and predictable federal liability standard corresponds with specific CERCLA objectives by encouraging settlements and facilitating a more liquid market in corporate and "brownfield" assets. *See* 42 U.S.C. § 9622 (encouraging CERCLA settlements "in order to expedite effective remedial actions and minimize litigation"); § 9607(r) (encouraging transfer and redevelopment of contaminated property under CERCLA's so-called "Brownfield Amendments")[8]; *cf. Polius v. Clark Equip. Co.*, 802 F.2d 75, 83 (3d Cir. 1986) ("Unforseeable

---

[8]In 2001, Congress amended CERCLA with the Brownfields Revitalization Act in order to spur the cleanup, transfer and redevelopment of contaminated land. Pub. L. No. 107-118, 115 Stat. 2356 (the "Brownfields Amendments"). Among other goals, the Brownfields Amendments encourage the acquisition and redevelopment of Superfund sites by according bona fide asset purchasers a defense to CERCLA liability. 42 U.S.C. § 9607(r)(1). The principal goal of the Amendments is to balance the interest in cost recovery under CERCLA's liability provisions with the economic interest in a liquid market for "brownfield" assets. Consistent with this purpose, a predictable test for successor liability lowers transaction costs and encourages brownfield acquisitions.

19

alterations in successor liability principles complicate transfers and necessarily increases transaction costs. Major economic decisions, critical to society, are best made in a climate of relative certainty and reasonable predictability.") (citation omitted).

*Smith Land*'s application of the "majority" standard fosters CERCLA predictability. It also accords respect to existing commercial relationships predicated on the majority state law, *cf. Kimbell Foods*, 440 U.S. at 728-29, while ensuring that responsible parties, including successor corporations, contribute their fair share to the cleanup of hazardous waste under the federal program. *Accord B.F. Goodrich v. Betkoski*, 112 F.3d 88 (2d Cir. 1997) (applying uniform federal standard); *Carolina Transformer*, 978 F.2d at 837 (4th Cir. 1992) (same); *Mex. Feed & Seed*, 980 F.2d at 487 n.9 (8th Cir. 1992) (dicta); *but see Davis*, 261 F.3d at 54 (1st Cir. 2001) (applying state law); *Atchison*, 159 F.3d at 361-64 (9th Cir. 1997) (dicta); *Anspec*, 922 F.2d at 1250 (6th Cir. 1991) (Kennedy, J., concurring).

*Davis*, the most recent court of appeals decision applying state law, held that CERCLA incorporates state successor liability rules unless the particular state law is "hostile to the federal interests animating CERCLA." 261 F.3d at 54 (1st Cir. 2001). *Davis* followed *Atchison*, where the Court of Appeals for the Ninth Circuit concluded that borrowing state law is consistent with CERCLA, because "[i]t is unrealistic to think that a state would alter general corporate law principles to

become a particularly hospitable haven for polluters." 159 F.3d at 364 (9th Cir. 1997). As a general matter, we agree it is unlikely that states would attempt to immunize their corporations from CERCLA liability. *See generally* Richard L. Revesz, *Rehabilitating Interstate Competition: Rethinking the "Race to the Bottom" Rationale for Federal Environmental Regulation*, 67 N.Y.U. L. Rev. 1210 (1992).

But neither *Atchison*, nor *Davis*, nor the concurring and dissenting opinion, address the conflict between CERCLA's objectives and borrowing unpredictable state successorship law. We believe that incorporating variable and uncertain state successor liability standards would increase significantly CERCLA litigation and transaction costs—in conflict with the statutory interests embodied in 42 U.S.C. § 9622, which aims to encourage early settlements, and § 9607(r), which aims to facilitate a liquid market in brownfield assets. *See In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 206 (3d Cir. 2003) (emphasizing CERCLA's policy of minimizing litigation costs); *United States v. DiBiase*, 45 F.3d 541, 545-46 (1st Cir. 1995) (explaining CERCLA's policy of reducing "transaction costs"); *see generally United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 520 (1st Cir. 1996) (surveying empirical research on the "huge resources going into the transactions costs of CERCLA litigation" and observing that reducing these costs was a primary objective of the 1986 amendments to the statute).

To summarize, the Supreme Court has neither overruled nor directly undermined *Smith Land*. Furthermore, a uniform

21

federal standard is appropriate under *Kimbell Foods* and *O'Melveny*: (1) the nature of the federal program, a comprehensive federal liability statute, counsels in favor of national uniformity; (2) a uniform successor liability standard is necessary to advance CERCLA's remedial objectives and to facilitate a fluid market in corporate and brownfield assets; and (3) uniform application of the majority state standard accords proper respect to commercial relationships predicated on the majority state law. Therefore, we will apply "the general doctrine of successor liability in operation in most states." *Smith Land*, 851 F.2d at 92.

The concurring and dissenting opinion contends that we reach an "unnecessary" holding on this issue, emphasizing that Pennsylvania law mirrors the majority "de facto merger" standard and would yield the same result. But *Smith Land* and *Lansford-Coaldale* preclude exclusive reliance on the law of a particular state. For the reasons stated, we believe these decisions remain controlling. More fundamentally, because CERCLA's goal of minimizing litigation and transaction costs is ill-served by a case-by-case approach to the question of successor liability choice-of-law, we need not inquire whether Pennsylvania law conflicts with or mirrors the majority successor liability doctrine before holding that a federal rule applies.

We add a final note on nomenclature and its pitfalls. Part of the difficulty in this area may stem from imprecise use of the term "federal common law." In its strictest sense, federal

22

common law represents the judicial "creation" of law under a generalized statutory mandate. *Atherton*, 519 U.S. at 218. Examples include the federal labor laws, *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957), and ERISA, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989). In recent years the Supreme Court has emphasized that the cases requiring this brand of federal common law are "few and restricted." *O'Melveny*, 512 U.S. at 87 (citation omitted). To view every ambiguous federal statute as authorizing an expansive body of "federal common law" would be an invitation to federal courts to eviscerate both the *Erie* doctrine and the concept of dual sovereignty it embodies.

But the "creation" of federal common law must be distinguished from statutory interpretation. *See Atherton*, 519 U.S. at 218. Ambiguous federal statutes generally do not authorize the creation of a new (and preemptive) body of federal law. *Id*. But this principle does not require that every federal statutory gap be filled by way of state-by-state interpretation. "In almost any statutory scheme, there may be a need for judicial interpretation of ambiguous or incomplete provisions. But the authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt." *Northwest Airlines, Inc. v. Transp. Workers Union*, 451 U.S. 77, 97 (1981); *see also Atherton*, 519 U.S. at 218 (distinguishing the "creation" of federal common law from "interpretation of a federal statute or a properly promulgated administrative rule").

23

In the case of federal liability statutes enforced under a federal cause of action, the law is generally intended to have uniform nationwide application. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) ("federal statutes are generally intended to have uniform nationwide application"); *Jansen v. Packaging Corp.*, 123 F.3d 490, 507 (7th Cir. 1997) (en banc) (Posner, J., concurring and dissenting). The most recent Supreme Court cases, both decided after *O'Melveny* and *Atherton*, followed this approach. *Clackamas*, 538 U.S. at 448 (2003); *Burlington*, 524 U.S. at 754-55 (1998). These decisions affirm the view that uniform interpretation of an undefined term in a federal liability statute "is not free-wheeling common-law rulemaking," but rather "filling a statutory gap, a standard office of interpretation." *Jansen*, 123 F.3d at 507. Accordingly, supplying a uniform definition of "successor corporation" under CERCLA is a matter of interpreting the federal statute. *See* 42 U.S.C. § 9601(21) (including "corporations" among the "persons" covered by CERCLA); 1 U.S.C. § 5 (providing, as a rule of interpretation, that "the word 'company' or 'association', when used in reference to a corporation, shall be deemed to embrace the words 'successors and assigns of such company or association'").

**B.**

Turning to the appropriate liability standard, we are mindful of *Bestfoods*, where the Supreme Court held that CERCLA incorporates, but does not expand upon, "fundamental" common law principles of indirect corporate

24

liability.  524 U.S. at 62-64.  The general rule of corporate successorship accepted in most states is non-liability for acquiring corporations, with the following exceptions:

> The purchaser may be liable where: (1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company.

*Polius*, 802 F.2d at 78  (3d Cir. 1986) (stating general rule); 15 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 7122, at 227-48 (perm. ed., rev. vol. 1999) (collecting cases).

This case involves the "de facto merger" exception, which has four elements under the majority standard.  It applies where:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they

25

become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1457-58 (11th Cir. 1985) (stating the "majority" de facto merger standard); *Keller v. Clark Equip. Co.*, 715 F.2d 1280, 1291 (8th Cir. 1983) (same); 15 Fletcher, *supra*, § 7124.20, at 302 (stating majority rule and collecting cases). The majority standard generally tracks the inquiry under Pennsylvania law. *See SmithKline Beecham*, 89 F.3d at 162 n.6.

Based on the record, we agree with the District Court that the Price/General transaction constituted a de facto merger.

**(1)**

Under prong one—continuity of enterprise—General Battery purchased all of Price Battery's equipment and inventory, assumed tenancy of its manufacturing plant, and continued its production of batteries. The plant superintendent and middle managers retained their positions, as did the union employees, office personnel and sales force. General Battery

26

continued the employment of three senior Price Battery executives—the president, executive vice president, and vice president of manufacturing—who, among other duties, remained active in supervising the Hamburg plant. General Battery was supplied by Price Battery's vendors, served Price Battery's customers, and manufactured essentially the same battery products. In every operational respect—from management and employees to location and assets to products and general business operations—General Battery continued the Price Battery enterprise. We agree with the District Court's exemplary analysis under this element.

### (2)

De facto merger prong two—continuity of shareholders—presents a closer question. Prior to the transaction, William Price Sr. was the sole shareholder of Price Battery. He received from General Battery $2.95 million in cash, 100,000 shares of General Battery stock, and a seat on General Battery's board of directors in exchange for the Price Battery enterprise. At the time, 100,000 shares of General Battery stock were valued at approximately $1 million and represented 4.537% of its outstanding equity. Price Sr.'s resulting stake in General Battery was comparable to that of the company's two co-founders, who owned 5.12% and 4.44% of its stock, respectively.

The parties dispute whether this mixed cash/stock transaction evidences the requisite continuity of ownership.

Exide contends continuity of ownership is lacking where the seller receives "primarily" cash and a "small percentage" of the buyer's outstanding equity. The United States responds that "under the de facto merger exception, there is no requirement that the seller acquire majority control or any other specific percentage of the buyer, only that there be some continuity of shareholder ownership."

The standard applied in most states recognizes continuity of ownership where "the shareholders of the seller corporation . . . become a constituent part of the purchasing corporation." 15 Fletcher, *supra*, § 7124.20, at 302 (stating general rule); *Keller*, 715 F.2d at 1291 (8th Cir. 1983) (same); *see also SmithKline Beecham*, 89 F.3d at 162 n.6 (3d Cir. 1996) (Pennsylvania law).

This standard, which requires continuity rather than identity of ownership, corresponds with the general purposes of the successor liability doctrine. *See Cargo Partner AG*, 352 F.3d at 47 (2d Cir. 2003) (New York law) (holding continuity of ownership "is the essence of" a de facto merger); *Nat. Gypsum Co. v. Cont. Brands Corp.*, 895 F. Supp. 328, 337-38 (D. Mass. 1995) (collecting cases). The overriding goal of successor liability, and of the de facto merger inquiry, is to balance "the interest in preventing tortfeasors from externalizing the costs of their misconduct" with "the interest in a fluid market in corporate assets." *Vucitech*, 842 F.2d at 944 (7th Cir. 1988).

28

The continuity of shareholders element is designed to identify situations where the shareholders of a seller corporation retain some ownership interest in their assets after cleansing those assets of liability. *See generally* Marie T. Reilly, *Making Sense of Successor Liability*, 31 Hofstra L. Rev. 745 (2003); Mark J. Roe, *Mergers, Acquisitions and Tort: A Comment on the Problem of Successor Corporation Liability*, 70 Va. L. Rev. 1559 (1984). Successor liability in this context accords a legal remedy to injured third-parties, preventing the externalization of the seller's costs of doing business, and deterring transactions designed to impose the costs of misconduct on third-parties. *See SmithKline Beecham*, 89 F.3d at 164 (discussing remedial purposes of de facto merger doctrine). Identifying these transactions is the objective of the continuity of ownership requirement. *Nat'l Gypsum*, 895 F. Supp. at 337 (D. Mass. 1995); *Cargo Partner AG*, 352 F.3d at 47 (2d Cir. 2003).

But the cases do not, as Exide contends, distinguish sharply between transactions "primarily" for cash versus stock, or between large versus small percentage interests in the ongoing enterprise. Rather, only some continuity of ownership is required. There is no generally accepted common law distinction between primarily stock mergers, on the one hand, and primarily cash transactions, on the other.[9] Nor does

---

[9] *See, e.g., Wilson*, 356 A.2d 458 (N.J. Super. Ct. Law Div. 1976) (imposing successor liability where stock comprised less than half of purchase price); *Atlas Tool Co. v. Comm'r*, 614 F.2d

successor liability necessarily turn on the seller's percentage interest in the buyer.[10]  Although the "majority" standard is somewhat unsettled at this frontier of successor liability, the

860, 871 (3d Cir. 1980) (New Jersey law) ("Although there was no stock transfer here, and only cash was involved, there was clearly a continuation of stockholder interest."); *Bud Antle, Inc. v. E. Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985) ("At the very least, there must be some sort of continuation of the stockholders' ownership interests."); *Ametek, Inc. v. Pioneer Salt & Chem. Co.*, 709 F. Supp. 556, 560 (E.D. Pa. 1988) (holding a de facto merger is possible where the seller retains a "contingent stake . . . in its former business"); *Fenderson*, 581 N.E. 2d at 292 (Ill. App. Ct. 1991) (no requirement "that all or even most of the purchase price" be paid in stock).

[10]*See, e.g., Cargill*, 424 Mass. 356 (1997) (Massachusetts law) (finding continuity of ownership where seller received 12.5% stake in acquiring company); *United States v. Keystone Sanitation Co.*, 1996 U.S. Dist. LEXIS 13651, at *23-25 (M.D. Pa. Aug. 22, 1996) (federal law) (finding continuity of ownership where seller received less than 1% stake in buyer); *T.H.S. Northstar Assocs. v. W.R. Grace & Co.*, 840 F. Supp. 676 (D. Minn. 1993) (Minnesota law) (finding continuity where seller's owners received 2.27% of buyer's stock); *Glynwed*, 869 F. Supp. at 277 (D.N.J. 1994) (New Jersey law) ("continuity of ownership, not uniformity, is the test").

critical "continuity of ownership" inquiry appears to be whether the owners retained some ongoing interest in their assets.

Continuity of ownership is established under CERCLA where the owners of the predecessor enterprise become a "constituent part" of the successor by retaining some ongoing interest in their assets. *See* 15 Fletcher, *supra*, § 7124.20, at 302 (stating majority rule and collecting cases). Under this standard, William Price Sr. became a "constituent part" of General Battery when he received 100,000 shares of General Battery stock and a seat on General's board in exchange for the Price Battery enterprise.

## (3)

Under the third de facto merger element, it is apparent that Price Battery ceased operations, liquidated, and dissolved as soon as legally and practically possible. The Price/General agreement, which closed in February of 1966, required Price Battery to discontinue operations immediately and change its name to Price Investment Company. Price Battery did so. The agreement also required that Price Investment remain in existence from February through December of 1966, maintaining cash reserves pending completion of an audit and other contingencies. After this waiting period and following any adjustments in the purchase price, the agreement contemplated that Price Battery would liquidate and dissolve. Specifically, the contract provided "for the complete liquidation of Price and the distribution of all of its assets within the twelve month period

31

beginning [on February 8, 1966]." Price Investment filed for corporate dissolution on February 8, 1967, and formally dissolved approximately six months later.

The contractual requirement that Price Battery immediately change its name, cease operations, and subsequently liquidate and dissolve, is more characteristic of a merger than an asset purchase. As recognized under the de facto merger doctrine, an essential characteristic of a merger is that one corporation survives while another ceases to exist. *Knapp v. N. Am. Rockwell Corp.*, 506 F.2d 361, 367 (3d Cir. 1974) (Pennsylvania law). Here, the Price/General agreement expressly required the liquidation and dissolution of Price Battery as a condition of the transaction, suggesting a merger rather than the mere sale of Price Battery's assets.

Exide emphasizes Price Investment's failure to dissolve immediately, contending that for over a year "the two companies remained completely independent of each other in management and operations." But the more salient fact is that Price Battery immediately ceased ordinary business operations. Within one week of the closing date, Price Battery recast itself as Price Investment Company—a corporate shell that only held cash reserves pending final settlement with General Battery. Price Investment had no operations.

The *Knapp* case presented similar facts. There we held the seller company dissolved as soon as legally and practically possible. 506 F.2d at 369 (3d Cir. 1974) (Pennsylvania law).

32

The seller corporation in *Knapp* had "technically continued to exist until its dissolution approximately 18 months after the consummation of the transaction," *id.* at 364, but during that period it "had no substance" and "could not undertake any active operations." *Id.* at 369. As in *Knapp*, "barren continuation" of the seller company does not bar application of the de facto merger doctrine. *Id.* at 368. We agree with the District Court that Price Battery ceased operations, liquidated and dissolved as soon as legally and practically possible.

**(4)**

Finally, under prong four—assumption of obligations ordinarily necessary for the uninterrupted continuation of normal business operations—the Price/General agreement expressly provided that General Battery would assume Price Battery's contractual obligations and all other obligations appearing on Price Battery's balance sheet. This unambiguous assumption of obligations, including employment, sales and vendor contracts, satisfies the fourth de facto merger element.

**C.**

In sum, the de facto merger criteria are satisfied. Citing *Polius*, Exide responds with the overarching objection that "imposition of successor liability on a purchasing company long after the transfer of assets defeats the legitimate expectations the parties held during negotiation and sale." 802 F.2d at 83. But even if we accept this statement as a general proposition, the response here is twofold. First, application of the traditional de

33

facto merger standard, which generally tracks the Pennsylvania rule, can hardly come as a surprise to sophisticated corporate parties who transacted under Pennsylvania law. Second, CERCLA by its very nature upsets party expectations. Congress nevertheless viewed retroactive CERCLA liability as necessary to ensure that those "responsible for any damage, environmental harm, or injury from chemical poisons may be tagged with the cost of their actions." *Bestfoods*, 524 U.S. at 56 (quoting S. Rep. No. 96-848, 13 (1980)) (internal punctuation marks omitted).

We hold that General Battery and Exide, as successors to Price Battery, are responsible for the CERCLA liability of their predecessor.

**D.**

We briefly address the District Court's alternative holding that Exide is liable under CERCLA on a "substantial continuity" theory of successor liability.[11] Prior to *Bestfoods*, several courts adopted the "substantial continuity" test as a basis for CERCLA successor liability. *See N.Y. v. Nat'l Serv. Indus.*, 352 F.3d 682, 687-88 (2d Cir. 2003) (collecting cases). "Substantial continuity" eliminates certain elements of the de facto merger analysis—including the continuity of ownership

---

[11]The government does not seek affirmance on the basis of "substantial continuity" and does not cite any relevant law on the issue.

requirement—and in effect creates a more expansive rule of liability than is accepted in most states. *Id.* at 687 (noting substantial continuity is applied "by only a handful of states"). Recently, however, several courts of appeals have rejected the doctrine as inconsistent with *Bestfoods*, 524 U.S. 51 (1998).[12] We agree. *Bestfoods* held that CERCLA does not, *sub silentio*, abrogate fundamental common law principles of indirect corporate liability. 524 U.S. at 63-64. Accordingly, "substantial continuity" is untenable as a basis for successor liability under CERCLA.

## IV. Conclusion

We will affirm the judgment of the District Court.

---

[12]*See Nat'l Serv. Indus.*, 352 F.3d at 687 (2d Cir. 2003) (holding "the substantial continuity doctrine is not part of general federal common law and, following *Bestfoods*, should not be used to determine whether a corporation takes on CERCLA liability as the result of an asset purchase"); *Davis*, 261 F.3d at 53 (1st Cir. 2001) (same); *Atchison*, 159 F.3d 358 (9th Cir. 1998) (same).

**Concurring in part and dissenting in part**

RENDELL, Circuit Judge.

I agree with the majority's conclusion that the fact pattern presented was a *de facto* merger such that successor liability for purposes of CERCLA exists and therefore concur in its ultimate ruling. However, I part company with the majority regarding its decision to announce that the issue of successor liability in this context is controlled by federal common law. This determination is unnecessary to the resolution of the issues before us and runs counter to recent Supreme Court pronouncements which both call into question the concept of federal common law and explicitly state that only in the most limited of circumstances should we look beyond applicable state law. Moreover, two other courts of appeals – the First and the Ninth – have considered the precise issue before us and our opinion perpetuates a split among the courts of appeals. Those courts have opined that the Supreme Court's recent directives cast serious doubt on the advisability of creating federal common law to dictate the contours of successor liability under CERCLA.[13] The majority, however, embraces the application

---

[13]Interestingly, as we note below, one of the courts – the Ninth Circuit – had previously followed our lead in *Smith Land*, but more recently reevaluated its view in light of later Supreme Court precedent concluding, as we should, that creating federal common law should be a last resort.

36

of federal common law, relying instead on the outdated notion of promoting uniformity.

Over the course of the last decade, and since we decided *Smith Land & Improv. Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir. 1988) and *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209 (3d Cir. 1993), the Supreme Court has issued several opinions denouncing the creation of federal common law where state law would otherwise apply. Principally, in *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994), the Court rejected the notion that a federal common law rule regarding the imputation of corporate officer knowledge to a corporation should be applied in an action against the Federal Deposit Insurance Corporation ("FDIC"). The Court stated:

> The first of these contentions need not detain us long, as it is so plainly wrong. "There is no federal general common law, and ... the remote possibility that corporations may go into federal receivership is no conceivable basis for adopting a special federal common-law rule divesting states of authority over the entire law of imputation."

*Id.* at 83 (internal citation omitted) (citing *Bank of America Nat. Trust & Sav. Assn. v. Parnell*, 352 U.S. 29, 33-34 (1956)).

The *O'Melveny* Court went on to note that, with regard to "the central question of displacement of [state] law" in favor of a rule federal in nature:

37

[W]e of course would not contradict an explicit federal statutory provision. Nor would we adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law.

\* \* \*

. . . . As we proceed to explain, even assuming the inapplicability of FIRREA [Financial Institutions Reform, Recovery, and Enforcement Act of 1989] this is not one of those cases in which judicial creation of a special federal rule would be justified.

Such cases are, as we have said in the past, "few and restricted," *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963), *limited to situations where there is a "significant conflict between some federal policy or interest and the use of state law."* *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68 (1966). Our cases *uniformly require the existence of such a conflict* as a precondition for recognition of a federal rule of decision. *Kimbell Foods*, 440 U.S. at 728. Not only the permissibility but also the scope of judicial displacement of state rules turns upon such a conflict. *What is fatal to respondent's position in the present case is that it has identified no*

38

*significant conflict with an identifiable federal policy or interest.*

*O'Melveny & Myers*, 512 U.S. at 85, 87-88 (some internal citations omitted) (emphasis added). While *O'Melveny* did not involve CERCLA, nonetheless, the pronouncement of the Court regarding displacement of state law makes crystal clear that matters left unaddressed by a comprehensive federal statutory scheme are presumably left subject to the disposition provided by state law[14] – there must exist a conflict, identifiable and

---

[14]The issue before us is not the meaning of a term contained in CERCLA, as was the case in many of the cases cited by the majority. Rather, the issue before us is whether state or federal law regarding successor liability will apply when the courts are fashioning remedies under CERCLA. No one has contended we are construing a word or phrase in the statute. If we are, we should request further briefing on this issue as it has not been addressed by the parties.

CERCLA now counts a "corporation" as a "person" for purposes of liability, *see* 42 U.S.C. § 9601(21), but the statute itself clearly does not reference or provide for successor liability. Therefore, we are confronted with a matter in an otherwise detailed federal statutory scheme, not a mere need to attach meaning to a term of art employed but not defined by Congress, as was the case in *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003) (looking "to the
(continued...)

39

specific, with an important federal policy before we consider resorting to federal common law.

Three years after deciding *O'Melveny*, the Supreme Court again commented on the concept of "federal common law," in the case of *Atherton v. FDIC*, 519 U.S. 213 (1997). In *Atherton*,

---

[14](...continued)
common law to fill gaps in statutory *text*, particularly when *an undefined term* has a settled meaning at common law," in this case to define "employee under the ADA) (emphasis added); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 755 (relying on general common law of agency to define term "agent" under Title VII where state court decisions "determinations of employer liability under state law rely in large part on federal court decisions"); *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47, n.22 (1989) (using federal common law to define "domicile" under the Indian Child Welfare Act and noting that Congress had, in other parts of the legislation, stated explicitly where it wanted terms "defined by reference to tribal law or custom and to state law"); and *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) (employing federal common law to define "work made for hire" under provisions of the Copyright Act of 1976, a statute intended to broadly preempt state statutory and common-law copyright regulation). These cases would be informative if we too were focusing on the meaning given to a term in a federal statute, but that is not our focus.

40

the Court again emphasized the "precondition," *id.* at 218, that a conflict exist to warrant the conception of a federal rule; under the facts of the case before it, the Court stated that its initial inquiry must concern whether the application of *the relevant state law* standard of care to banks would conflict with, and thereby significantly undermine, an identifiable federal policy or interest:

> States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care. And by analogy, it has been argued, courts should look to federal law to find the standard of care governing officers and directors of federally chartered banks.
>
> To find a justification for federal common law in this argument, however, is to substitute analogy or formal symmetry for the controlling legal requirement, namely, the existence of a need to create federal common law arising out of a significant conflict or threat to a federal interest. *O'Melveny*, 512 U.S. at 85, 87.
>
> * * *
>
> In sum, we can find no significant conflict with, or threat to, a federal interest. The federal need is far weaker than was present in what the Court has called the "few and restricted' instances," *Milwaukee v. Illinois*, 451 U.S. 304, 313 (1981),

41

> in which this Court has created a federal common
> law.

*Atherton*, 519 U.S. at 224-25. The Court then detailed such "few and restricted" cases, which I list in the margin.[15] Again, the Court's focus was on the presence of a significant conflict. And, to discern whether a conflict is present, we are not to evaluate the jurisprudential landscape of all fifty states; rather, "federal courts should incorporate state law into federal

---

[15]As enumerated by the Court in *Atherton*: *See Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92 (1938) (controversy between two States regarding apportionment of streamwater); *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) (Federal Government contractors and civil liability of federal officials); *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 305 (1947) (relationship between Federal Government and members of its armed forces); *Howard v. Lyons*, 360 U.S. 593, 597 (1959) (liability of federal officers in the course of official duty); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964) (relationships with other countries). *See also Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641(1981) ("Absent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases").

common law unless *the particular state law in question* is inconsistent with the policies underlying the federal statute." *Kamen v. Kemper Fin. Servs.*, 111 S. Ct. 1711, 1722 (1991) (emphasis added).

Most recently, in *United States v. Bestfoods*, the Court was called upon to consider whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable under CERCLA as an operator of a polluting facility owned or operated by the subsidiary. 524 U.S. 51, 55 (1998). The Court answered in the negative, "unless the corporate veil may be pierced." *Id.* In so concluding, the Court expounded upon certain general principles of corporate law – for example, that parents are not liable for the acts of their subsidiaries, *id.* at 62, along with the "equally fundamental principle of corporate law" that a corporate veil may be pierced where the corporate form was misused, *id.* Significantly, the Court explained:

> Nothing in CERCLA purports to rewrite this well-settled rule, either. CERCLA is thus like many another congressional enactment in giving no indication "that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute," *Burks v. Lasker*, 441 U.S. 471, 478, 60 L. Ed. 2d 404, 99 S. Ct. 1831 (1979), and the failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that "in order to abrogate a common-law

43

principle, the statute must speak directly to the question addressed by the common law," *United States v. Texas*, 507 U.S. 529, 534, 123 L. Ed. 2d 245, 113 S. Ct. 1631 (1993) (internal quotation marks omitted). The Court of Appeals was accordingly correct in holding that when (but only when) the corporate veil may be pierced,  may a parent corporation  be charged with derivative CERCLA liability for its subsidiary's actions.

*Id.* at 63-64 (footnotes omitted).

As noted by the majority, the *Bestfoods* Court declined to reach the precise issue before us, noting a "disagreement" as to whether "courts should borrow state law, or instead apply a federal common law of veil piercing," 524 U.S. at 64, n.9, but sidestepping any conclusion: "Since none of the parties challenges the Sixth Circuit's holding that [certain companies] incurred no derivative liability, the question is not presented in this case, and we do not address it further," *id.*  The majority protests that the Court did not declare the use of federal common law inappropriate at this juncture or cite to *O'Melveny*.  But the Court clearly did not need to, or choose to, reach the issue.  We should infer nothing from its silence.

I find more significant the *Bestfoods* Court's affirmative discussion of  "norms of corporate behavior," which it viewed as constituting crucial reference points, along with the reliability of bedrock principles of corporate law.  *See, e.g.*, 524 U.S. at 70

44

n.13 & 71. I cannot help but conclude that reference to the "norms" bolsters the view that existing state corporate law principles should control, and we need not invent federal law, or deem them "federal", in order to further CERCLA's regulatory scheme. The Court's discussion of "congressional silence" concerning these "bedrock" corporate principles, which it describes as "audible," supports this view. 524 U.S. at 62. With respect to the silence wrought by Congress' failure to address, in the statute, the claim at issue in *Bestfoods*, notably, the Court stated that "CERCLA is thus like many another congressional enactment in giving no indication 'that the entire corpus of state corporation law is to be replaced simply because the plaintiff's cause of action is based upon our federal statute.'" *Bestfoods*, 524 U.S. at 63 (quoting *Burks v. Lasker*, 441 U.S. 471, 478 (1979)). Indeed, the *Bestfoods* Court chided the district court in that case for having "treated CERCLA as though it displaced or fundamentally altered common law standards of limited liability" because "such a rule does not arise from congressional silence, and CERCLA's silence is dispositive." 524 U.S. at 70. Finally, it bears noting that the Supreme Court affirmed the court of appeals' determination applying Michigan law that a parent may be held liable only where the corporate veil may be pierced. *See United States v. Cordova Chem. Co.*, 113 F.3d 572, 580 (6th Cir. 1997).

After reading these three recent Supreme Court opinions, I am left with the clear impression that the notion of resorting to a federal rule of successor liability here, mandating it as controlling in our Circuit without regard to state law, would not be endorsed by the Supreme Court. The overarching theme is that state law should not be displaced unless the particular state

45

law at issue conflicts with an important federal policy. Noticeably absent is any reference to the majority's guiding theme – that of the need for uniformity. And, as I discuss more fully below, uniformity for uniformity's sake is not such a policy.

The courts of appeals that have addressed this issue agree that the Supreme Court's recent decisions discussed above have moved toward reliance on state law, and away from the creation of federal common law, unless a conflict exists. In *Atchison, T. & S.F. Ry. v. Brown & Bryant*, 159 F.3d 358 (9th Cir. 1997), the Court of Appeals for the Ninth Circuit considered whether the Supreme Court's pronouncements on this issue in *O'Melveny* and *Atherton* (*Bestfoods* had not yet been decided) were clear enough to cause it to abandon its own previous determination in *Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260 (9th Cir. 1990) (adopting Third Circuit's rationale in *Smith Land*) that the parameters of successor liability under CERCLA should be fashioned by federal common law in order to promote national uniformity. The *Atchison* court concluded that although the *Atherton* and *O'Melveny* opinions implicated FIRREA, and not CERCLA, the underlying analysis was nonetheless applicable and persuasive. 159 F.3d at 362. Thus, in concluding that the promotion of national uniformity does not justify application of federal common law to CERCLA, the Court effectively rejected its previous determination in *Louisiana-Pacific* along with that opinion's underlying rationale – our own opinion in *Smith Land*.

Initially, the *Atchison* Court correctly noted that "simply because a federal statute is involved does not always mean that federal courts should fashion a uniform federal rule." 159 F.3d

46

at 362 (citation omitted). "Frequently, state rules of decision will furnish an appropriate and convenient measure of the governing federal law." *Id.* The subsequent discussion merits repeating in full:

> In *Louisiana-Pacific*, we agreed with the Third Circuit that CERCLA's "'meager legislative history available indicates that Congress expected the courts to develop a federal common law to supplement the statute.'" 909 F.2d at 1263 (quoting *Smith Land*, 851 F.2d 86 at 91). This legislative history consists of a discussion in Congress that common law should govern the issue of joint and several liability under CERCLA. *Louisiana-Pacific* recognized that Congress did not address the particular issue of successor liability under CERCLA.
>
> *O'Melveny* tells us that when dealing with a "comprehensive and detailed" federal statutory regulation, a court should instead presume that matters left unaddressed in such a scheme are subject to state law. "Congress acts . . . against the background of the total *corpus juris* of the states . . . ." *Atherton*, 117 S. Ct. at 670 (alteration in original). The formation of corporations and the dissolution and continuing liability of corporations are traditional areas of state law. As CERCLA lacks any clear directive that federal courts develop standards for successor

47

liability, we turn to the *Kimbell Foods* test, as clarified by *O'Melveny* and *Atherton*.

\* \* \*

Although *Louisiana-Pacific* refers to the "need for national uniformity" as a reason for developing federal rules for successor liability, *Atherton* notes that "to invoke the concept of 'uniformity' . . . is not to prove its need." 117 S. Ct. at 671; *see also O'Melveny*, 114 S. Ct. at 2055 (recognizing how generic and "lightly invoked" is the need for uniformity). Although often invoked in this context, there has been no real explanation of the need for uniformity in the particular area of successor liability - especially since state law will in many other instances determine whom the EPA may or may not look to for compensation. If state law varied widely on the issue of successor liability, perhaps the need for a uniform federal rule would be more apparent. This is not the case, however, as "the law in the fifty states on corporate dissolution and successor liability is largely uniform." *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1249 (6th Cir. 1991) (Kennedy, J., concurring) (holding that state law determines successor liability under CERCLA). The argued "need" for uniformity thus stems not from disarray among the various states, but from the alleged need for a more expansive view of successor liability than state law currently

provides - in other words, the notion that state law on this issue is inadequate for CERCLA's purposes.

But *O'Melveny* and *Atherton* also speak to this argument. Before a court can recognize a federal rule of decision, there must be a "'significant conflict between some federal policy or interest and the use of state law.'" *O'Melveny*, 114 S. Ct. at 2055 (quoting *Wallis*, 384 U.S. 63 at 68). Indeed, such a conflict is a "precondition" to fashioning federal common law rules. *Atherton*, 117 S. Ct. at 670. The Court's recent cases clarify that to demonstrate such a conflict, more than speculation is required - there must be a "specific, concrete federal policy or interest that is compromised" by the application of state law. *O'Melveny*, 114 S. Ct. at 2055. We therefore doubt that the concern noted in *Louisiana-Pacific* is sufficient grounds for developing a federal rule of decision.

*Atchison*, 159 F.3d at 362-64 (certain internal citations and footnotes omitted).[16] The *Atchison* Court concluded that it

---

[16]The majority excerpts a line of dicta from *Atchison* in which the Court muses that if "state law varied widely on the issue of successor liability, perhaps the need for a uniform federal rule would be more apparent." (Maj. Op. at 17.)

(continued...)

would not adopt the "substantial continuation" exception (which would have expanded federal common law liability). It then reasoned that because the same result would flow in the case before it under either state law or federal common law, it need not decide whether state or federal law governs successor liability under CERCLA. *Id.* at 364. Despite bypassing the question we now consider, it is abundantly clear that the Ninth Circuit, were its hand forced, would follow the recent directives of the Supreme Court and hold that state law should govern successor liability under CERCLA.

Even more recently, and with the benefit of the *Bestfoods* opinion, the Court of Appeals for the First Circuit, considering

---

[16](...continued)
However, as the more fully excerpted passage above shows, the Court goes on to explain that this need not preoccupy it because, first and foremost, the Supreme Court has made clear that there must exist a significant conflict between some federal policy or interest and the use of state law.

In disagreeing with the *Atchison* Court on this point, and by citing what it views as a varied set of state laws concerning successor liability as the jumping off point for application of a federal rule, the majority leapfrogs over the critical inquiry – whether there exists a conflict between Pennsylvania law and an important federal policy or interest. Lack of uniformity itself does not satisfy the requirement that a conflict exist – only *after* a conflict has been identified does the Supreme Court direct us to evaluate the need for a uniform rule.

50

displacement of Connecticut state law to determine successor liability under CERCLA, did just that:

> We have concluded that the majority rule is to apply state law "so long as it is not hostile to the federal interests animating CERCLA," and have applied Massachusetts contracts law to determine an issue of successor liability. *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 406 (1st Cir. 1993). Recent Supreme Court precedent confirms that *Boyd's* approach is correct. The Court applied state corporation law in a recent CERCLA case involving the potential liability of a parent corporation for its subsidiary and left little room for the creation of a federal rule of liability under the statute. *See United States v. Bestfoods,* 524 U.S. 51, 63 (1998) ("CERCLA is . . . like many another congressional enactment in giving no indication that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute.") (internal quotation marks omitted). The Court's statements in *Bestfoods* and *O'Melveny* demonstrate that to justify the creation of a federal rule, "there must be a specific, concrete federal policy or interest that is compromised by the application of state law." *Atchison, Topeka & Santa Fe Railway Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 363-64 (9th Cir. 1998) (internal quotation marks omitted). We see no evidence that application of state law to the facts of this

51

case would frustrate any federal objective.
Connecticut's "mere continuation" test thus is the
correct test for determining successor liability for
the hazardous waste disposed.

*United States v. Davis*, 261 F.3d 1, 54 (1st Cir. 2001).

As recognized by the *Atchison* and *Davis* courts, the Supreme Court has repeatedly emphasized that a specific and identifiable conflict must be present before we should invoke and apply a federal rule of decision. Here, no such conflict exists. Absent evidence that application of Pennsylvania state law, not the hypothetical application of the law of 49 other states, *does* frustrate CERCLA's purpose – holding liable parties responsible for the costs associated with the clean up of hazardous waste sites – and in the face of recent Supreme Court opinions discouraging the creation of a federal rule of decision, it is readily apparent that resort to any law other than Pennsylvania's is unnecessary and uncalled for.

I subscribe to and seek to reiterate a number of the majority's threshold observations, which it appears to note but then discard: namely, that the Supreme Court has "cautioned against the unwarranted displacement of state law" (Maj. Op. at 11) (citing *O'Melveny*, 512 U.S. at 87); additionally, that "[i]ncorporation of state law is particularly favored in the area of corporate law, because business decisions proceed in reliance on the applicable state standards" (*Id.*) (citing *Kamen*, 111 S. Ct. at 1722); and, finally, that absent some significant conflict arises between a federal policy interest and the use of state law, "state corporation law generally should be integrated into the federal

52

statutory regime." (*Id.*) (citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979)) (other citations omitted). But, it is not clear to me why, in the face of these guiding principles, the majority then frames the issue before us simply as "whether CERCLA requires a uniform federal standard of corporate successor liability." (Maj. Op. at 11.)

The majority's determination that application of federal common law is warranted here hinges on our previous terse treatment of the issue in *Smith Land & Improv. Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir. 1988) and *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209 (3d Cir. 1993), cases in which the Court advanced only one animating rationale for adopting the "general doctrine of successor liability in operation in most states," 851 F.2d at 92 – the need for a uniform and predictable body of law. We did so in a few conclusory sentences, without any meaningful discussion. Intervening Supreme Court precedent makes clear, however, that this rationale is no longer, if it ever was, paramount when evaluating whether we are confronted with "one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 89 (1994). To the extent *SmithLand* and *Lansford-Coaldale* command us to ignore in our analysis longstanding, ingrained principles of state corporate law in favor of "that most generic (and lightly invoked) of alleged federal interests, the interest in uniformity," *id*. at 88, those decisions should be reevaluated. *George Harms Constr. Co. v. Chao*, 371 F.3d 156 , 161 (3d Cir. 2004) ("We recognize that we may reevaluate a precedent in light of intervening authority even without en banc consideration."); *United States v. Adams*, 252 F.3d 276, 286 (3d

53

Cir. 2001) ("Although a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel, a panel may reevaluate a precedent in light of intervening authority.") (internal quotations omitted). We must reevaluate the exalted position that we previously afforded "uniformity" in light of the Supreme Court's direction that we are to employ a different mode of analysis.[17]

The majority asserts that resort to federal common law is necessary because state laws concerning successor liability are not uniform and thus, without fashioning a federal rule of decision, predictability will be lacking. To say that the need for uniformity is the articulated federal policy supplying the rationale for creating federal common law is to put the analytic rabbit in the hat, so to speak. If uniform application is indeed the goal, resort would never be had to state law assuming some variation as among the different laws. Uniformity cannot be, and has never been said to be, the single animating principle. While it is a laudable goal, it is not one that has served as the basis on which the Supreme Court, or any other court of appeals to have addressed the issue, has rejected the application of state law. Rather, as discussed above and made clear in *O'Melveny* and *Atherton*, those courts that have considered rejecting the application of a particular state law in favor of a federal scheme have done so only when the state law in question *clearly conflicted* with an important federal policy to be advanced. *See,*

_____

[17]To the extent that it could be argued that adopting this position requires us to convene the Court en banc and overrule prior opinions, then I would urge that we do so.

*e.g.*, *Kamen*, 500 U.S. at 98; *Boyle*, 487 U.S. at 504; *Texas Industries, Inc.*, 451 U.S. at 641; *Wallis*, 384 U.S. at 68; *Sabbatino*, 376 U.S. at 425; *Wheeldin*, 373 U.S. at 651; *Lyons*, 360 U.S. at 596; *Standard Oil Co. of Cal.*, 332 U.S. at 305. *See also Redwing Carriers, Inc., v. Saraland Apartments*, 94 F.3d 1489, 1501-02 (11th Cir. 1996) (holding that state law should be adopted as the federal standard for determining whether a limited partner may be held accountable for the CERCLA liability of the partnership). These cases also make clear that it is the second factor of the *Kimbell Foods* test[18] which should receive paramount consideration. The Supreme Court in *O'Melveny* and *Atherton* cite to the *Kimbell Foods* test in direct support of the precept that "when courts decide to fashion rules of federal common law, 'the guiding principle is that a significant conflict between some federal policy or interest and the use of state law . . . must first be specifically shown.' Indeed, such a 'conflict' is normally a 'precondition.'" *Atherton*, 519 U.S. at 218 (quoting *O'Melveny*, 512 U.S. at 87, and citing *Kimbell Foods*, 440 U.S. at 728). The Court in

---

[18]The *Kimbell Foods* test details three considerations relevant to the determination of whether federal common law or state law should provide the rule of decision: 1) whether the nature of the federal program requires national uniformity; 2) whether the application of state law would frustrate specific objectives of the federal program; and 3) whether the application of federal law would disrupt commercial relationships predicated on state law. *See Adams v. Madison Realty & Dev., Inc.*, 937 F.2d 845, 856 (3d Cir. 1991) (citing *Kimbell Foods*, 440 U.S. at 728-29).

*Atherton* cites to *Kimbell Foods* an additional time, where it explains, "To invoke the concept of 'uniformity,' [] is not to prove its need." 519 U.S. at 220 (citing *Kimbell Foods*, 440 U.S. at 730 (rejecting "generalized pleas for uniformity")). Certainly, neither opinion relies, as the majority seems to do, on *Kimbell Foods*' other espoused consideration – whether the federal program requires uniformity, or come close to elevating this factor to the point of deeming it a "precondition," as has the Court with respect to the presence of a significant conflict.[19]

Clearly, the required conflict does not exist here; application of Pennsylvania law produces the desired result. Therefore, we need not abandon Pennsylvania law, nor should we label the rule applied today by the majority "federal." Accordingly, I respectfully dissent from the reasoning contained in the majority's opinion but concur in the resulting affirmance of the District Court's order.

---

[19]*Bestfoods* does not even cite to *Kimbell Foods*.